UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————

SARAH MELVILLE,                                        **Civil Action No.: 21-cv-396**

                   Plaintiff,             **COMPLAINT**

      -against-

BLUE LABEL APPAREL, LLC                    ***Jury Trial Demanded***
d/b/a BORNFLY d/b/a
OVED APPAREL CORPORATION d/b/a
COLUMBIDAE COOP, LLC, EVAN DAVIS,
and DAMIAN DOLLY,

                 Defendants.

—————————————————————

    PLAINTIFF  Sarah Melville by her attorney Goddard Law PLLC, whose offices are located at 39 Broadway, Suite 1540, New York, New York 10006, alleges upon knowledge with respect to herself, and upon information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

    1.    This is civil action brought on behalf of Plaintiff Sarah Melville against Defendant Blue Label Apparel LLC d/b/a "BornFly" d/b/a Oved Apparel Corporation d/b/a Columbidae Coop, LLC, ("Defendant Blue Label") for gender, religious, and disability discrimination and retaliation in violation of Title VII and the Americans with Disabilities Act, and against Defendant Blue Label, Evan Davis ("Defendant Davis"), and Damian Dolly ("Defendant Dolly")(collectively "Defendants") for gender, religious, and disability discrimination and retaliation in violation of the New York State Human Rights Law and the New York City Human Rights Law, together with any and all other causes of action which can be reasonably inferred from the facts as set forth below.

## PARTIES

2.      Plaintiff Sarah Melville (hereinafter "Plaintiff ") is a Jewish female citizen of the United States who, at all times relevant herein, suffered from a disability and/or was perceived as disabled, and who currently resides in Syosset, New York and at all relevant times worked in New York, New York.

3.      Plaintiff was, at all times relevant herein, an "employee" of Defendants within the meaning of all relevant Federal, State and local laws.

4.      As a Jewish woman with a disability and/or perceived disability, she is a member of a protected class within the meaning of all relevant Federal, State and local laws including, but not limited to, Title VII, the Americans with Disabilities Act, the New York State Human Rights Law, and the New York City Human Rights Law.

5.      Upon information and belief, at all times relevant herein, Defendant Blue Label is a corporation organized under the laws of the State of New York with headquarters and/or offices at 31 West 34th Street, Suite 401, New York, New York 10001.

6.      Upon information and belief, at all times relevant herein, Defendant Davis is the President of Blue Label, and manages, runs, and operates Defendant Blue Label. At all times relevant, Defendant Davis was Plaintiff's supervisor and worked at Defendant Blue Label's headquarters and/or offices at 31 West 34th Street, Suite 401, New York, NY 10001.

7.      Upon information and belief, at all times relevant herein, Defendant Dolly was Director of Design at Defendant Blue Label. At all times relevant, Defendant Dolly was Plaintiff's supervisor and worked at Defendant Blue Label's headquarters and/or offices at 31 West 34th Street, Suite 401, New York, NY 10001.

8.     All Defendants were, at all times relevant herein, Plaintiff's "employer" within the meaning of all relevant Federal, State and local laws, including but not limited to Title VII, the Americans with Disabilities Act, the New York State Human Rights Law, and the New York City Human Rights Law.

## FACTUAL BACKGROUND

9.     Plaintiff was hired by Defendant Blue Label in and around January 2014, and was given the title "Assistant Fashion Designer."  Plaintiff was responsible for "design work," which included several tasks, including organizing fabric swatches for sampling, commenting on all samples in sampling stages, assisting other members of the design team with cleaning the worktable, communicating with factories, and creating technical packages.

10.     Defendant Blue Label utilized an open workspace floor plan, which included a large open space with desks and tables where employees were seated.  Due to the open workspace floor plan, all employees, managers, and the President of the company Evan Davis ("Defendant Davis"), Director of Design Damian Dolly ("Defendant Dolly") and later, Director of Production Ashod Spendjian ("Director Spendjian"), co-workers Alex Song ("Employee Song") and Robert Hayes ("Employee Hayes") regularly heard each other's conversations

### Plaintiff  is Subjected to a Hostile Work Environment at Defendant Blue Label

11.     Shortly after beginning her employment with Defendant Blue Label, Plaintiff noticed that the atmosphere was extremely hostile and discriminatory, and a discriminatory "old boy's environment."

12.     Plaintiff's male co-workers openly and routinely discussed viewing pornography, masturbation, sex, female and male genitalia, female employee's breast size, "boob jobs" (elective

breast surgery), sexually transmitted diseases, "strippers" and "prostitutes," Defendant Dolly's sex life, and they expressed homophobic and transphobic views.

13.     They used the words "You're retarded" to insult each other, referred to wearing a full marching pants, shirt and jacket set as "going full retard" and used what they believed to be the voice that someone with disabilities, or with Down's Syndrome, would allegedly use in a disparaging manner, ridiculing and insulting disabled persons.

14.     Additionally, Plaintiff's male co-workers and supervisors regularly and loudly played music with highly offensive and misogynistic lyrics. The songs included continued references to "d*cks," "cl*ts," "p*ssy," and "tips." Defendant Dolly regularly played such music and he played it at an extremely high volume.

15.     Plaintiff repeatedly expressed her discomfort with the lewd conversations and the disturbing, loud music while she worked, but her objections were ignored.

16.     Despite her obvious discomfort, her male coworkers purposefully said outrageous things in front of her and even went so far as to attempt to involve her in the offensive discussions.

17.     On many occasions, Director Dolly inappropriately touched female employees, including an occasion where he made a photocopy of his own hand, taped it to a stick, and used it to touch a female employees rear end. See Exhibit 1, annexed hereto.

18.     Upon information and belief, they found her discomfort amusing and went out of their way to make her more uncomfortable, for example asking her whether or not she thought a particular co-worker had a large penis, and regularly making "jokes" to her about a particular employee having a "micro-penis."

19.     Plaintiff repeatedly objected to the conversations by saying such things as, "Are we really talking about this in the office right now?" "Are you really saying these things to me?"

"This is really not appropriate for the office," "Please don't say things like that to me," and "Please don't say things like that in front of me." Her co-workers and supervisors simply laughed at her and continued the inappropriate conversations in front of her and making comments to her.

20.    When Plaintiff began working at Defendant Blue Label, three other women worked in the office.  The women objected to the clearly sexist and misogynistic behavior, but they were ignored or ridiculed when they did so. Though they were clearly uncomfortable, they also sometimes tried to fit in by going along with the jokes to "choose their battles."

21.    One of the women who worked there had a particular issue with the fact that Defendant Dolly and Marketing Employee Clive Srail ("Mr. Srail") talked at length about the fact that Mr. Srail said that he was having sex with a woman who called him "Daddy." He stated that he told her to keep calling him Daddy and that she repeatedly called him Daddy after that.  He also imitated the woman calling him Daddy while having sex.  One of Plaintiff's coworkers became extremely upset and repeatedly asked him to stop saying "Daddy," but in response, he simply said it more.

22.    The female employee became more and more agitated, and was clearly having a traumatic response to Mr. Srail's continued use of the word "Daddy."  She got so upset that she had to leave work.  After the female co-worker left, Mr. Srail joked, "Oh gee, now I've done it," and he and Defendant Dolly continued to laugh uproariously.

23.    Plaintiff responded, "You just really upset her, all you had to do was stop saying that word and you couldn't do it. Why is this so hard for you?  She is clearly traumatized, and there is a real reason behind her reaction, so just stop saying it."

24.    Defendant Dolly and Mr. Srail reacted angrily and reprimanded Plaintiff for getting involved in something "that was not her business" and that "didn't have anything to do with her."

Plaintiff reminded them that she and everyone else heard these conversations due to the open floor plan, and again begged them to stop talking about things that clearly upset their coworker. They laughed and completely ignored her objections to their sexist and discriminatory comments.

25.     Upon information and belief, there was no Human Resources office for Plaintiff to report anything to, and in any case, all of the Supervisors were aware of, but did nothing about the hostile and discriminatory environment Plaintiff was subjected to at Defendant Blue Label.

### Non-Jewish Employees Make Discriminatory Comments About Jews and Plaintiff's Exercise of Religion

26.     Plaintiff was the only Jewish person at Defendant Blue Label, and was open about the fact that she was Jewish to her employees and managers.

27.     Defendant Blue Label's managers and employees, who were, upon information and belief, not Jewish, asked her bizarre and offensive questions about Jewish people, saying, disparagingly "Don't Jewish people believe in Hell?" or other questions. They also specifically "forgot" that Plaintiff did not eat pork or shellfish because of her religious beliefs when her supervisors bought lunch for everyone, .about her beliefs that singled out Plaintiff's religion as allegedly bizarre or not "normal." Plaintiff felt humiliated that she was being singled out for these strange and discriminatory questions about her faith.

28.      Employees joked disgustingly about Orthodox Jews allegedly having to "have sex through a hole in a sheet," and other Orthodox practices They rolled their eyes and bitterly complained that Jewish employees at Defendant Blue Label's parent company were permitted to leave work early on Fridays for the Sabbath, and that Jewish employees could take off for "too many" Jewish holidays.

29.     When Plaintiff told her managers that she would have to leave at 6:00 or 7:00 pm to go to a Sabbath dinner, they rolled their eyes, scolded her, and said that she had "too much work to do." Plaintiff felt pressure to keep her job, and so she regularly cancelled her Sabbath plans.

### Plaintiff is Treated Differently Due to her Gender

30.     Shortly after beginning her employment with Defendant Blue Label, Plaintiff noticed that she was treated less well than her male coworkers. She was routinely assigned menial tasks that her male co-workers were not ordered to do.  Especially egregiously, she was made the "cleaning lady" of the office and ordered to keep the shared work space clean and organized, even when the messes were made by her male co-workers, including trash that her male co-workers generated and purposefully left on the table for *her* to clean.  Male employees then ordered her to clean up their mess, and criticized her for not cleaning up after *them*. Upon information and belief, male employees were never asked to do cleaning tasks, and in fact Plaintiff was ordered to clean up after the male employees.

31.     Upon information and belief, Defendant Blue Label considered these tasks to be "women's work," and assigned them to Plaintiff because she is female. When directed to clean up after one of her male co-workers, usually by Defendant Dolly, Plaintiff regularly pointed out that she had not made the mess and that this was her male co-workers "trash" or "garbage."   In response, Defendant Dolly exasperatedly told her that Defendant Davis did not like messes and had that it was "her job" to keep the office clean.

32.     Plaintiff was also regularly yelled at by one of her male co-workers, whereas this co-worker never yelled at the male members of her team. Because the co-worker yelled at Plaintiff in the open-seating plan and in front of the whole team , Defendant Dolly was witness to the yelling and was also witness to how humiliated Plaintiff was.  Instead of stepping in, Defendant Dolly

made it clear that he found the confrontations extremely amusing. When Plaintiff asked Defendant

Dolly to step in and address the issues between herself and the male co-worker, Defendant Dolly

refused to do so.  Upon information and belief, Defendant Dolly would not have allowed a male

employee to be regularly yelled at and humiliated in front of the entire staff.

**Plaintiff's Boss Makes a Sexual Advance Towards Her**

33.     In or about 2014, Plaintiff was horrified when she received a notification that her

supervisor Defendant Dolly had "liked" her on a dating website, which indicated that he was

interested in dating her.

34.     Disgusted, Plaintiff chose not to answer this obvious proposition to have a romantic

or sexual relationship with her, but was ashamed because of the sexual harassment in her boss's

advance towards her. She felt humiliated and violated, and knew that if she did talk about it with

him or report this to Defendant Davis, she would suffer ridicule by the male teammates and

managers, and fury from Defendant Dolly.

**Defendant Davis Acknowledges the Hostile Work Environment But Fails to Act**

35.     In or around the fall of 2015, Plaintiff pulled Defendant Davis aside privately and

had a meeting with him to discuss the unprofessional behavior in the office and how uncomfortable

it made her feel, in the hopes that he would do something about it.  Plaintiff specifically stated that

the music and the inappropriate conversations about sex made her feel very uncomfortable.

36.     During the meeting, Defendant Davis, who sat in the open seating plan with all of

the employees, acknowledged that he was well aware of the inappropriate conversations and music

in the office, and that he also felt uncomfortable about it and did not like it.  During the

conversation he told Plaintiff that "if [Defendant BornFly] wasn't doing so well, I would just shut

[the office] down, because [the environment] is that bad."  He then told her that he avoided coming

8

into the office because of the inappropriate conversations and that he disliked the loud, offensive music as well.

37.     Plaintiff also told Defendant Davis that she was being yelled at in front of the entire team by one of her male co-workers and that Defendant Dolly refused to do anything about it.

38.     Defendant Davis then changed the topic of the conversation and told Plaintiff that it would be "better for her career [at Defendant Blue Label]" if she took a more production-focused path.  In response, Plaintiff objected, and stated that she had been hired with the job title of "Designer" to do design work, and *not* production work, and wanted to do more design work.  She also reminded him that her education was in design, that she had no interest in doing production work, and that production was not the direction that she intended her career to go in.

39.     Upon information and belief, "production work," requires less skill than design work, at which Plaintiff was an expert, and was a considerable "demotion" of her work responsibilities at Defendant Blue Label.

40.     Defendant Davis replied, "Well, your career here might be headed more in that direction."

**<u>Defendant Dolly Criticizes Plaintiff for "Complaining"</u>**

41.     Later that same day, Plaintiff saw Defendant Dolly and he angrily approached her and said, "we need to talk outside." Plaintiff, realizing that Defendant Davis must have told Defendant Dolly about her complaints, was horrified and believed that she was going to be fired for reporting the discriminatory environment to Defendant Davis. Defendant Dolly had never taken her outside to have a discussion before.

42.     Defendant Dolly took Plaintiff downstairs on the street and began angrily berating her for complaining to Defendant Davis about the office environment. Defendant Dolly demanded

to know exactly what she talked to Defendant Davis about. She told him that she had reported the offensive music and conversations as well as well as the fact that the other employee screamed at her and only her.

43.    In response, Defendant Dolly told her angrily, "Well, it's an open office so you just have to deal with [the music and the offensive conversations]."

44.    Defendant Dolly was clearly outraged and told her that if she wanted to work at Defendant she had to "get over it" and accept that she worked in an open office space.  Upon information and belief, Defendant Dolly believed that he and the other employees were allowed to say whatever sexist, homophobic, anti-disabilities, and discriminatory comments they wanted and play whatever sexist and discriminatory music they wanted in the open office space and if Plaintiff did not like hearing the offensive language, they should quit.

45.    Defendant Dolly told her furiously that it was not acceptable for her to "tell on people" and try to get people "in trouble."

46.    Plaintiff replied, "I have repeatedly told you how uncomfortable the blasting of inappropriate music makes me and how uncomfortable the environment makes me and you just never take it seriously."

47.    Defendant Dolly said, "Well, we still don't tattle on each other; that is just not something that we do here."  He ended the conversation by telling Plaintiff that she "really needed to put on [her] big girl pants," and that "[Defendant Blue Label's] environment is not the kind of environment where we complain about things to HR or tell on each other."

48.    Upon information and belief, Defendant Dolly was making clear to Plaintiff that if she did not stop complaining about the discriminatory and hostile work environment, she would be terminated. Thus, Defendant Dolly was threatening Plaintiff's job in retaliation for reporting

the discriminatory and hostile environment and warning her that she would likely be fired or otherwise retaliated against if she reported discrimination.

49.     From that moment on, Defendant Dolly was even more hostile and dismissive of Plaintiff. Upon information and belief, Defendant Dolly was intent on firing Plaintiff or getting her to quit, because she had objected to and reported the discrimination and hostile work environment.

## Plaintiff is Assigned More Production Work

50.     In or around October 2015, "Jane Doe," one of the few female employees at Defendant Blue Label, and who was the Director of Production, was terminated and replaced with Director Spendjian, a male employee.

51.     Upon information and belief, Jane Doe was terminated because she was very open with Defendant Blue Label and particularly her managers, about family planning, wanting to get pregnant, and doing treatment in order to get pregnant that regularly caused her to visit the hospital and doctors and resulted in time off from work. Defendant Blue Label employees, including Defendant Dolly, constantly complained about Jane Doe missing work when she was at doctor's appointments for family planning. Upon information and belief, Defendant Blue Label's management did not complain about male employees missing work.

52.     Defendant Dolly and others in Defendant Blue Label's management also constantly complained about another female employee, who had a chronic heart condition. When this employee went to the hospital or a doctor's appointment, her supervisors would complain that she was "not there" or "not doing her work," and Defendant Davis would incessantly call or text her with work assignments even when she was absent taking care of her health.

53.     Upon information and belief, whenever a female employee called out sick, or had to miss work because of a disability, Defendant Blue Label's managers inundated them with demanding and threatening emails and text messages and did not do so to male colleagues.

54.     Following the termination of the female employee, a vast majority of the production work was reassigned to Plaintiff, thereby severely increasing her workload and making her job production focused instead of design focused.  Meanwhile, even though Plaintiff  took over the vast majority of Jane Doe's work, and had to do her design work as well, she was not given Jane Doe's former title, Director of Production, nor Jane Doe's  significantly higher salary. Plaintiff told Jane Doe after she left that she had been given Jane Doe's production work, but without an increase in salary. Jane Doe told Plaintiff that given what Jane Doe had been making, Plaintiff was entitled to at least $20,000 more than Plaintiff was currently making.

55.     Upon information and belief, in addition to not paying her for the additional work that she did, Plaintiff was paid less than her similarly situated male co-workers, who had the same supervisors at Defendant Blue Label, for the same work and duties at Defendant Blue Label.

56.     Upon information and belief, Plaintiff was assigned extra, unpleasant work because Defendant Dolly wanted to constructively terminate her because she had complained about discrimination.

57.     Also upon information and belief, in or about October 2015, male members of Defendant Blue Label's team brought into work a birthday cake for a male team member with two female Barbie dolls on top in what they referred to as the "Two Girls One Cup" position, which is a sexist and disgusting sexual position based on a sexual video, and they all laughed and made lewd jokes again in front of Plaintiff. See **Exhibit 2** for photograph of same. Plaintiff was disgusted

by the sexual and sexist nature of this birthday cake, and objected to the male managers that she was disgusted by it.

## Defendant Davis Continues to Ignore Plaintiff's Complaints

58.     Thereafter, the atmosphere at Defendant Blue Label continued to be discriminatory, sexist, and hostile, and new hire Director Spendjian added to the hostile environment. He repeatedly talked about how he looked in a speedo bathing suit, made fun of other employees' sexual competence. Plaintiff continued to be subjected to inappropriate sexual conversations and offensive music on a daily basis.

59.     Bizarrely, when they interacted for work, Defendant Davis complained about the inappropriate and hostile environment to Plaintiff.

60.     Each time he did so, Plaintiff would say things like "Well yes, it's not just going to stop; you have to stop it," and  "You have to have a meeting about it,"  "It's horrible, and it's even worse when you are not here." and "If you think this is bad, you should see what it's like when you are not here."

61.     Defendant Davis replied, "Yes, I am sure it's even worse when I'm not here" and repeated, as he often did, that he avoided the office because the environment was so bad. Exasperated, Plaintiff replied, "Well, maybe the office would benefit from you being more present." Defendant Davis replied, "I can't. I'm too busy."

62.     Upon information and belief, Defendant Davis wrongfully believed that if he did not regularly witness the discrimination and hostile work environment, he was not required to address or correct the behavior.

63.     Upon information and belief, Defendant Davis grossly failed in his duty to protect his employees from gender discrimination and a hostile work environment based on that discrimination.

**Defendant Dolly Monitors Plaintiff's Time - and Texts her in the Restroom**

64.     After he took her outside to confront her about "telling" on her co-workers, Defendant Dolly began monitoring Plaintiff's time in a bizarre manner.  Especially disturbingly, when she went to the restroom Defendant Dolly would text or email her and demand that she return to work.  Upon information and belief, he took extremely long restroom breaks, as did several of their male coworkers but he did not text other male employees when they were in the restroom.

**Defendant Davis Fails to Act on Plaintiff's Reports of Discrimination**

65.     In 2017, the environment became increasingly more hostile, discriminatory, and sexist, and Plaintiff was again forced to raise her objections to this behavior to Defendant Davis. She specifically told him that the office atmosphere would not improve unless he did something about it and asked him to address it.

66.     Much to Plaintiff's relief, Defendant Davis called a staff meeting shortly after their conversation. However, during this meeting he only broadly broached employee conduct in the office and told employees "to behave" because a new employee was starting.

67.     Much to Plaintiff's shock and disappointment, thereafter Defendant Davis primarily focused on the employee dress code and failed to discuss in any way the sexist, discriminatory, and hostile work environment.  During the meeting, he utterly failed to mention the inappropriate music and the sexist conversation in the office, though Plaintiff had specifically asked him to do so, and though he regularly acknowledged, was well aware of, and himself disliked the hostile environment.

**Defendants Demote the Only Female Supervisor**

68.     Shockingly, at or about that time, Defendant Blue Label's only remaining female supervisor, whom Plaintiff knew was successful at her job, was demoted and her position was

filled by a male named Neil Goodman ("Director of Sales Goodman").  Upon information and belief, Defendant Davis decided that he wanted a male to run the Sales department instead of a female because of their sexist attitudes about women in leadership positions.

69.     Director of Sales Goodman immediately joined in the hostile atmosphere.  He repeatedly offered his snacks to other employees while saying, "does anyone want some of my nuts," in an egregiously sexual manner, while laughing.

70.     He also touched staff members in a way that made Plaintiff and other employees uncomfortable, like giving them long "hugs" or touching their arms or their shoulders inappropriately.

71.     He referred to Plaintiff as "Jewish Girl" and treated her in a demeaning manner as if she were his personal assistant and or secretary.

72.     On one occasion, he had an inappropriate conversation with Plaintiff about the way that her pants fit. Instead of objecting or criticizing Director of Sales Goodman, the male staff members laughed.

73.     After a meeting, Plaintiff said to Defendant Davis, "This is supposed to be a professional atmosphere, why is he allowed to say these things to me?"  Making excuses for him simply because he was an "older" employee, Defendant Davis replied, "He's a relic, he's part of a different generation where staying stuff like that is ok." Plaintiff replied, "Actually, it's not ok." President David replied, "Well, it is what it is."

**The Hostile Environment Continues**

74.     Thereafter several employees, including Defendant Dolly, continued to have loud and lewd conversations about their sexual practices, which included explicit descriptions of the manner in which they liked to masturbate. Specifically, Defendant Dolly loudly discussed that he

masturbated "all day, every day." He then appallingly told the entire staff that the "reason he took so long in the [office] bathroom was because he was masturbating [in the bathroom]."

75.    Specific examples of the outrageous conversations include Defendant Dolly and other male employees referring to other employees as "tranny," or saying "sing it, tranny" when someone, usually a female, sang along to a song, a term which was repeatedly used in the office in a denigrating manner. Upon information and belief, "tranny" is a derogatory term for a transgender individual. They also stated "No Homo!" as if being gay or lesbian was an insult.

76.    Other examples include Manager Booker telling Director Spendjian, "Ashod, don't let anyone jerk your gherkin.  Only your wife should do that" and Manager Booker offering Director Spendjian powder for his "sweaty balls."

## Plaintiff Faces Hostile and Disrespectful Behavior from Her Co-Employees

77.    The more Plaintiff expressed disapproval about the hostile and unprofessional environment, the more she was frozen out. Following her complaints, Plaintiff was regularly ignored or mansplained because she was a woman.  I was regularly ignored or mansplained. Not because of complaints, but because I'm a woman, Plaintiff was ignored during staff meetings. Her male co-employees and supervisors continually interrupted her and/or refused to listen to her. Specifically, Director Spendjian screamed over her several times when she was attempting to speak during meetings.

78.    Furthermore, the male employees continually dismissed her input. She had to repeat herself five or six times on multiple occasions to try to have any of her input heard.

79.    Plaintiff continually expressed her desire to do meaningful design work but her superiors ignored her and assigned her what they clearly considered to be "women's work" –

essentially cleaning and organizing, and being largely the only one to communicate back and forth with factories, like I was a secretary the office.

80.     In addition, upon information and belief, Defendant Dolly further retaliated against Plaintiff for complaining about the hostile work environment by giving her bogus and unnecessary last-minute assignments and demanding that they be performed immediately, which was impossible given her workload.

81.     Defendant Dolly began habitually giving Plaintiff last minute work assignments and ordered her to stay late, even though she was scheduled to leave work at 6:00 pm.

82.      These last-minute assignments included such mundane tasks as reorganizing closets.  Upon information and belief, Plaintiff was assigned such work and told that it had to be done immediately in retaliation for complaining about the hostile work environment and the gender discrimination, and because Defendant Blue Label wanted to fire her but instead hoped that she would quit.

83.     In addition to being dismissed in team meetings and being forced to work late doing mundane tasks, she was still subjected to inappropriate conversation, sexually explicit and inappropriate lyrics, and upon information and belief, she was passed over for promotions and raises and paid less than her male co-workers.

84.     Upon information and belief, the mistreatment was done in further retaliation for her objections about the hostile work environment at Defendant Blue Label and in an effort to constructively terminate her.

### Directors Dolly and Spendjian Makes Loud References to their Sexual Performance and Pornography

85.     In or about September 2017, Director Spendjian and Defendant Dolly engaged in a highly offensive and hostile conversation which centered around Defendant Dolly's sexual

performance after ingesting ginseng.  Director Spendjian responded that "some of us don't need help in that area," and laughed uproariously.

86.  Also in or about September 2017, Defendant Dolly was working on his computer he unexpectedly and regularly and repeatedly loudly shouted "scheisse porn," which, according to what Plaintiff's co-workers smugly informed her, is pornography that involves defecation.

## Plaintiff is Retaliated Against for a Disability

87.  On or around September 14, 2017, Plaintiff  returned to work after being diagnosed with a serious medical condition.  Because of the open office environment, Plaintiff quietly notified Defendant Dolly that she had recently been diagnosed with a serious medical condition and that she was required to take medication that caused her to have serious stomach distress which may cause her to spend more time in the bathroom.  Plaintiff felt that she had to inform him because he so closely monitored her bathroom use.

88.  In response, Defendant Dolly advised her that she should "use a diaper next time." He did so in an extremely loud manner with the obvious intention of embarrassing Plaintiff  in front of her co-workers, which utterly humiliated her.

## Plaintiff Is Forced to Listen to Defendant Dolly Discuss His Sex Life

89.  Shortly thereafter, Defendant Dolly was loudly discussing the length of his penis and the amount of time it takes him to have an orgasm during intercourse.  He would also routinely discuss his dates and describe in great detail the sexual encounters that he had with various women. The conversations made Plaintiff extremely uncomfortable.

## Plaintiff is Scrutinized and Penalized Unlike Her Male Coworkers

90.  In addition to being assigned menial tasks and clean-up work that were outside the scope of her job duties, Defendant Blue Label's management continued to excessively

micromanage her lunches and breaks and would criticize and discipline her if she felt she took too long.  Her male co-employees would routinely take long lunches and breaks and upon information or belief were never disciplined.

91.     Upon information and belief, this disparity in treatment was discriminatory and because of her sex.

### Plaintiff  is Forced to Listen to Sexually Inappropriate and Offensive Music

92.     In and around December 2017 and January 2018, Defendant Dolly continued to loudly play offensive, misogynistic music.  He began regularly and repeatedly playing and singing along with an especially offensive song called "F*ck You Bitch," which included lyrics discussing genitalia and using the "n-word" repeatedly.  Defendant Dolly sang the lyrics while looking at Plaintiff, as if he were saying the lyrics to her in order to mock her because she was obviously so uncomfortable with this.

93.     When Plaintiff expressed her discomfort and asked Defendant Dolly to turn the song down he responded by increasing the volume of the song and loudly singing the words to the song while staring at her.

94.     On one occasion, Defendant Dolly played music that did not contain derogatory comments about women and offensive language. Plaintiff commented to him that she appreciated the change in music in the hopes that he would stop playing this.

95.     Upon hearing this, Defendant Dolly immediately changed the music and began playing sexually offensive and inappropriate music loudly in the office.

96.     Plaintiff repeatedly asked Defendant Dolly and her male co-workers to play their music at a lower volume, wear headphones, or play less offensive music but each request was refused.

## Defendant Dolly Harasses Plaintiff for Taking a Lunch Break

97.     On or around February 9, 2018, Plaintiff left the office for her scheduled lunch break.  While she was out, Defendant Dolly sent her several irate text messages demanding to know where she was and told her that she could not leave the office if there was work to be done.

98.     In one particular text, Defendant Dolly said, "You think taking a long lunch or going to the gym when you are also planning to leave early today is a good thing to do?"  Plaintiff responded "Who's taking a long lunch or going to the gym? I'll be back in 5 minutes."

99.     Defendant Dolly threateningly responded, "Good … making sure … stuff like that does not go over well with me." At this same time, a male co-employee, Employee Song, was out of the office and had been gone for even longer but, upon information and belief, he was not reprimanded or questioned.

100.    Furthermore, Defendant Dolly did not speak to male employees in the derogatory way he spoke to Plaintiff.

## Plaintiff is Forced to Look at an Inappropriate Picture by Defendant Dolly

101.    In or around mid-April 2018, Defendant Dolly announced loudly that he had found a piece of toilet paper with excrement on it in the bathroom, which he took a picture of and walked around the office showing a photo of the toilet paper and repeatedly demanded that Plaintiff  look at the picture. Plaintiff  repeatedly refused to look at the picture.

102.    Later, Defendant Dolly told Plaintiff  that he needed her to look at a file for work purposes.  When Plaintiff looked at what she thought was the "work file" she saw that she was looking at the picture of the toilet paper with excrement on it. Defendant Dolly and several of her (male) colleagues laughed uproariously.  Plaintiff was horrified and disgusted.

**Defendant Dolly Sends a Rude and Abrasive Email Reprimanding Plaintiff**

103.   On around June 15, 2018, Defendant Dolly sent Plaintiff an email harshly reprimanding Plaintiff for alleged missteps, when these accusations were uncalled for and exaggerated.  To Plaintiff's extreme embarrassment, several other employees were cc'd on the rebuking email. Upon information and belief, Defendant Dolly did not harshly reprimand male employees, and certainly did not carbon copy other employees if he did so. Upon information and belief, Defendant Dolly sent the email and cc:ed other employees as a part of his effort to constructively terminate Plaintiff .

**Plaintiff is Retaliated Against for Observing a Religious Holiday**

104.   Plaintiff requested that, in observance of Rosh Hashanah, a Jewish holiday, she be scheduled paid time off of work on September 11, 2018 and September 12, 2018.  Plaintiff submitted her request far in advance of the requested days off.

105.   On or around this time, Plaintiff and Employee Song were working to meet a deadline, which fell during her off time for Rosh Hashanah.  Plaintiff's requests to attend religious services for the Jewish were utterly ignored as she was repeatedly reminded for weeks before that she was needed on the project. Defendant Dolly and Employee Song were hostile because she would be out of the office to observe the religious holiday. Upon information and belief, it was Defendant Blue Label's practice to give employees a day off for religious observance.

106.   While she was absent, upon information and belief, Defendant Blue Label's management complained about Plaintiff being out on "vacation" despite the deadline, when Plaintiff was observing the religious holidays.

107.   Defendant Dolly informed Plaintiff that she would need to "make up the days" she took off for Rosh Hashanah on Martin Luther King, Jr. Day and Good Friday – even though

Defendant Blue Label offices are closed on those holidays. Fearful for her job, Plaintiff worked in the office completely alone on these holidays, and he was fearful for her safety as a woman, given the office had little security.

108.    Upon information and belief, no male or non-Jewish employees had ever been told that they had to come in to "make up" days when they took off for religious holidays.

109.    Upon information and belief, Plaintiff was penalized for taking religious holidays as part of Defendant Blue Label's efforts to constructively terminate her in retaliation for objecting to and reporting the hostile work environment.

110.    Following her complaints of discrimination, Plaintiff was continually subjected to abusive and disparate treatment by her superiors and co-employees on a consistent basis while she was employed by Defendant Blue Label, especially after she repeatedly reported discrimination.

**Plaintiff becomes Defendant Blue Label's ONLY Female Employee**

111.    By October of 2018, Defendant Blue Label employed only two female employees. Upon information and belief, due to the hostile work environment complaints, Defendant Blue Label had decided to hire only men.

112.    Although Plaintiff had five female co-workers working in the office when Plaintiff started, two of the women were terminated, one was constructively terminated in 2016, and in October of 2018, a third co-worker was constructively terminated after being demoted so a male could lead her department.   Thereafter, Plaintiff was the only female employee and the environment became more hostile than ever. Plaintiff felt very alone and she tried to keep her head down as the fraternity like atmosphere continued.

<u>**Plaintiff Suffers Serious Medical Issues**</u>

113.    Plaintiff's chronic digestive conditions became extremely bad and she began experiencing migraine headaches, severe lightheadedness, debilitating stomach pain, and recurrent bouts of vomiting and diarrhea.

114.    After visiting several doctors she was told that she needed to get an endoscopy and several other tests.

115.    Plaintiff told Defendant Dolly and Director Spendjian several times privately how serious her medical issues were, and that she had severe headaches, lightheadedness, and dizziness, or that her "computer was spinning," that she had severe stomach problems, and that she experienced nausea and was vomiting in the office. She told Director Spendjian that she had a sharp pain in her rib. She told both Defendant Dolly and Director Spendjian that she was very concerned and scared about what was going on with her health, and believed it was serious.

116.    When Plaintiff told Defendant Dolly that she would be leaving to go to the doctor, he automatically responded with "Well, we have work to do" and gave her annoyed and disparaging looks, simply for requesting to leave to address her medical issues. Whenever Plaintiff told Defendant Dolly she was going to the doctor, he would say "You're leaving??" "You're acting like you don't want to be here," or "You need to get it together." Plaintiff repeatedly said that she was telling the truth, and that she really did have serious health issues, and that she was getting treatment from a doctor. Defendant Dolly sent text message to her my coworkers asking asked them if she was "really sick," disbelieving her, and Defendant Dolly always rolled his eyes, grunted, turned away, and/or refused to say goodbye. The more Plaintiff requested time off for her serious medical issue, the more hostile Defendant Dolly became towards her.

117.    Upon information and belief, Defendant Blue Label's management perceived her as being disabled and was concerned that she would miss work for her medical procedures, and also concerned that she could be diagnosed with a chronic disability that would cause her to miss work.

118.    In or about mid-December 2018, Plaintiff told Defendant Blue Label's management that she was going to have to miss work on several occasions over the next few months due to medical testing.

**Plaintiff is Discriminatorily and Retaliatorily Terminated**

119.    Upon information and belief, the news about her medical issues was the final straw. After repeatedly complaining about the gender-based hostile work environment, which made her a target for termination, she now had a serious medical issue on top of this.

120.    Defendant Blue Label terminated Plaintiff on January 2, 2019, less than three weeks after she made Defendant Blue Label aware of her medical issues.

121.    Upon information and belief, Plaintiff was fired for taking time to address her serious medical issue, because Defendant Blue Label perceived her as being disabled and did not want to risk employing someone who was about to be diagnosed with a serious medical condition, and in retaliation for objecting to and reporting severe and pervasive discrimination and harassment.

**AS AND FOR THE FIRST CAUSE OF ACTION**
*(Gender and Religious Discrimination in Violation of Title VII Against Defendant Blue Label)*

122.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

123.    Defendant Blue Label has discriminated against Plaintiff on the basis of her gender and religion in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.,* as

amended by the Civil Rights Act of 1991 ("Title VII"). Plaintiff has suffered both disparate impact and disparate treatment as a result of Defendant Blue Label's wrongful conduct.

124.     Defendant Blue Label has discriminated against Plaintiff by treating her differently from and less preferably than similarly-situated male and non-Jewish employees and by subjecting her to severe and pervasive harassment, a hostile work environment, discriminatory pay, discriminatory denial of promotions, disparate terms and conditions of employment on the basis of her sex and religion.

125.     Defendant Blue Label's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

126.     By reason of Defendant Blue Label's discrimination, Plaintiff is entitled to all remedies available for violations of Title VII.

### AS AND FOR THE SECOND CAUSE OF ACTION
*(Retaliation in Violation of Title VII Against Defendant Blue Label)*

127.      Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

128.     Plaintiff repeatedly objected to and reported to Defendant Blue Label about Defendant Blue Label's discriminatory treatment of her.

129.     In retaliation, Defendant Blue Label subjected Plaintiff to a series of adverse employment actions including, but not limited to, subjecting Plaintiff a hostile work environment, disparate treatment, and a termination of Plaintiff's employment.

130.     Defendant Blue Label's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff.

131.     As a result of Defendant Blue Label's conduct alleged in this Complaint,

Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

132.     By reason of Defendant Blue Label's retaliation, Plaintiff is entitled to all remedies available for violations of Title VII.

## AS AND FOR THE THIRD CAUSE OF ACTION
*(Gender and Religious Discrimination in Violation of the New York City Human Rights Law, and the New York State Human Rights Law Against All Defendants)*

133.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

134.     Defendants have discriminated against Plaintiff on the basis of her gender and religion in violation of the New York State Human Rights Law and the New York City Human Rights Law. Plaintiff has suffered both disparate impact and disparate treatment as a result of Defendants' wrongful conduct.

135.     Defendants have discriminated against Plaintiff by treating her differently from and less preferably than similarly-situated male and non-Jewish employees and by subjecting her to severe and pervasive harassment, a hostile work environment, discriminatory pay, discriminatory denial of promotions, disparate terms and conditions of employment, and/or other forms of discrimination on the basis of her sex and religion.

136.     Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

137.     By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of the New York City Human Rights Law and the New York State Human Rights Law. Plaintiff shall seek attorney's fees and punitive damages.

## AS AND FOR THE FOURTH CAUSE OF ACTION
*(Retaliation in Violation of the New York State Human Rights Law
and the New York City Human Rights Law Against All Defendants)*

138.      Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

139.      Plaintiff repeatedly objected to and reported to Defendants about Defendants' discriminatory treatment of her.

140.      In retaliation, Defendants subjected Plaintiff to a series of adverse employment actions including, but not limited to, subjecting Plaintiff severe and pervasive harassment, a hostile work environment, discriminatory pay, discriminatory denial of promotions, and disparate terms and conditions of employment.

141.      Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff.

142.      As a result of Defendants' conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

143.      By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of the New York State Human Rights Law and the New York Human Rights Law. Plaintiff shall seek attorney's fees and punitive damages.

## AS AND FOR THE FIFTH CAUSE OF ACTION
*(Disability Discrimination and/or Perceived Disability Discrimination and Retaliation in
Violation of the New York State Human Rights Law and the New York City Human Rights Law
Against All Defendants)*

144.      Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

145.    Defendants subjected Plaintiff to discrimination, a hostile work environment, and an atmosphere of adverse employment actions and decisions because of her actual and/or perceived disability in violation of Plaintiff's statutory rights.

146.    Plaintiff repeatedly objected to and reported to Defendants about Defendants' discriminatory treatment of her.

147.    In response to Plaintiff's exercise of her rights under the New York State Human Rights Law and the New York City Human Rights Law, Defendants subjected Plaintiff to a hostile work environment and ultimately terminated Plaintiff.

148.    As a direct and proximate result of Defendants' unlawful employment practices, Plaintiff has suffered extreme mental anguish, outrage which has manifested in physical symptoms, severe anxiety about her future, harm to her physical well-being and health, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her personal and professional reputation, disruption of her personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

149.    Accordingly, Defendants discrimination retaliated against Plaintiff in violation of her statutory rights as guaranteed by the New York State Human Rights Law and the New York City Human Rights Law.

## AS AND FOR THE SIXTH CAUSE OF ACTION
*(Disability Discrimination and/or Perceived Disability Discrimination and Retaliation in Violation of the Americans with Disabilities Act Against Defendant Blue Label)*

150.    Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

151.    Defendant Blue Label subjected Plaintiff to discrimination, a hostile work environment, and an atmosphere of adverse employment actions and decisions because of her actual and/or perceived disability in violation of Plaintiff's statutory rights.

152.    In response to Plaintiff's exercise of her rights under the ADA, Defendant Blue Label subjected Plaintiff to severe and pervasive harassment, a hostile work environment, discriminatory pay, discriminatory denial of promotions, disparate terms and conditions of employment and ultimately terminated Plaintiff.

153.    As a direct and proximate result of Defendant Blue Label's unlawful employment practices, Plaintiff has suffered extreme mental anguish, outrage which has manifested in physical symptoms, severe anxiety about her future, harm to her physical well-being and health, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her personal and professional reputation, disruption of her personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

154.    Accordingly, Defendant Blue Label discriminated and retaliated against Plaintiff in violation of her statutory rights as guaranteed by the Americans with Disabilities Act.

### AS AND FOR THE SEVENTH CAUSE OF ACTION
*(Unequal Pay in Violation of the Equal Pay Act Against Defendant Blue Label)*

155.    Plaintiff repeats and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

156.    At all times relevant to this action, Plaintiff was employed by Defendant Blue Label within the meaning of the Fair Labor Standards Act ("FLSA") 29 U.S.C. §§ 201 *et seq.*, as amended to include the Equal Pay Act, 29 U.S.C. §§ 206(d) *et seq.*

157.    At all times relevant to this action, Defendant Blue Label was an employer within the meaning of the FLSA and the Equal Pay Act.

158.    The acts, practices and policies of Defendant Blue Label, as set forth above, constitute discrimination against Plaintiff, in violation of the FLSA and the Equal Pay Act, by unlawfully paying female employees less than male employees for equal work. Upon information and belief, Defendant Blue Label was aware of complaints made by Plaintiff concerning Defendant's unfair pay practices, but did not rectify or investigate its unlawful pay practices.

159.    Defendant Blue Label's violations of the Equal Pay Act were willful and/or reckless, entitling plaintiff to the three year statute of limitations and liquidated damages available under the FLSA and the Equal Pay Act.

**AS AND FOR THE EIGHTH CAUSE OF ACTION**
*(Unequal Pay in Violation of the Equal Pay Act Against Defendant Blue Label)*

160.    Plaintiff repeats and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

161.    At all times relevant to this action, plaintiff was employed by defendants within the meaning of Article 6 of the New York Labor Law §§ 190, *et seq.*

162.    Defendants violated the right of Plaintiff to be paid the same as male employees performing equal work, in violation of New York Labor Law § 194.

163.    The acts, practices and policies of Defendant Blue Label, as set forth above, constitute discrimination against plaintiff, in violation of the New York State Equal Pay Act, N.Y. Labor Law § 194, *et seq.*

164.    Upon information and belief, Defendant Blue Labelwas aware of complaints by Plaintiff concerning Defendant's unfair pay practices, but did not rectify or investigate its unlawful pay practices.

165.    Defendants violations of the New York Labor Law §§ 190, *et seq.*, were therefore willful within the meaning of N.Y. Labor Law § 198, entitling plaintiff to liquidated damages.

## <u>RELIEF</u>

**WHEREFORE**, for the foregoing reasons, Plaintiff demands judgment against Defendants, for all compensatory, emotional, physical, and punitive damages, lost pay, front pay, injunctive relief, and any other relief to which the Plaintiff is entitled. It is specifically requested that this Court grant judgment in favor of Plaintiff as follows:

(i)     On the First Cause of Action, awarding Plaintiff compensatory damages in an amount to be determined at trial but in any case, no less than $1,000,000.

(ii)    On the Second Cause of Action, awarding Plaintiff compensatory damages in an amount to be determined at trial but in any case, no less than $1,000,000.

(iii)   On the Third Cause of Action, awarding Plaintiff compensatory damages in an amount to be determined trial but in any case, no less than $1,000,000;

(iv)    On the Fourth Cause of Action, awarding Plaintiff compensatory damages in an amount to be determined trial but in any case, no less than $1,000,000;

(v)     On the Fifth Cause of Action, awarding Plaintiff compensatory damages in an amount to be determined trial but in any case, no less than $1,000,000;

(vi)    On the Sixth Cause of Action, awarding Plaintiff compensatory damages in an amount to be determined trial but in any case, no less than $1,000,000;

(vii)   On the Seventh Cause of Action, awarding Plaintiff compensatory damages in an amount to be determined trial but in any case, no less than $1,000,000, including but not limited to back pay with interest and equity pay based on Plaintiff's appropriate compensation had her rights not been violated and had she not been discriminated against;

(viii)  On the Eighth Cause of Action, awarding Plaintiff compensatory damages in an

amount to be determined trial but in any case, no less than $1,000,000, including but not limited to back pay with interest and equity pay based on Plaintiff's appropriate compensation had her rights not been violated and had she not been discriminated against;

(ix)    Awarding Plaintiff all damages including liquidated damages and punitive damages to which she is entitled, as well as the costs and disbursements of this action, including reasonable attorneys' fees, together with such other and further relief as this court deems equitable, proper, and just.

Dated:  New York, New York
        January 15, 2020

                                Respectfully submitted,

                                GODDARD LAW PLLC
                                *Attorney for Plaintiff*

                                By: */s/ Megan S. Goddard*
                                    Megan S. Goddard, Esq.
                                39 Broadway, Suite 1540
                                New York, NY 10006
                                Office: 646-504-8363
                                Fax: 212-473-8705
                                Megan@goddardlawnyc.com